IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2024

# IN RE TEMPERANCE A.[1]

**Appeal from the Chancery Court for Montgomery County**
No. AD-21-47     Matthew Joel Wallace, Judge
_____

## No. M2023-00641-COA-R3-PT
_____

Mother appeals the termination of her parental rights. The trial court found four statutory grounds for termination: abandonment by failure to visit, abandonment by failure to support, persistent conditions, and failure to manifest an ability and willingness to assume custody. The trial court also concluded termination was in the child's best interest. Neither the guardian ad litem nor Mother received notice of the trial court's Order. Becoming aware of the trial court's Order more than thirty days after the decision, Mother filed a motion asking the trial court to set aside and then re-enter its final order, seeking to ensure that she could still appeal. The trial court granted Mother's motion. Mother appeals, arguing the trial court erred with regard to each ground of termination that it found and that its conclusion as to the best interest of the child was also in error. On appeal, Petitioners, paternal grandparents seeking to terminate Mother's parental rights, argue the trial court erred in setting aside and then re-entering its termination order and, consequently, that this court lacks jurisdiction over Mother's appeal. The Petitioners also defend the trial court's termination decision on the merits. We conclude this court has jurisdiction over Mother's appeal, that the trial court did not err in finding that grounds were established for termination, and that the trial court did not err in finding that termination is in the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

John Parker, Clarksville, Tennessee, for the appellant, Heavenly B.

Jennifer Scribner, Clarksville, Tennessee, Guardian ad Litem for the minor child,

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

Temperance A.

James R. Potter, Clarksville, Tennessee, for the appellees, Kimberly A. and Steven A.

## OPINION

### I.

Heavenly B. (Mother) and Jared A. (Father) are the biological parents of Temperance A. Temperance's paternal grandparents, Kimberly A. (Paternal Grandmother) and Steven A. (Paternal Grandfather) (collectively Petitioners), filed a petition in the Chancery Court of Montgomery County seeking to terminate Mother's and Father's parental rights and to adopt Temperance. Father has been largely absent from Temperance's life. He surrendered his parental rights, and he consents to Petitioners' adoption of Temperance. This appeal concerns Mother's appeal of the trial court's decision to terminate her parental rights.

Temperance, who was born in December 2016, was conceived as a result of a brief relationship between her biological parents. Mother informed Father of the conception; he did not inform his parents. A few weeks after Temperance's birth, Mother sought out Petitioners to let them know they had a granddaughter and to introduce them to their grandchild. Mother, who was in the process of relocating to live with her own grandmother in Oklahoma, asked Petitioners to care for Temperance while Mother settled into living in Oklahoma. Petitioners agreed, caring for Temperance until Mother was ready for her.

Things quickly deteriorated with Mother's living situation with her grandmother in Oklahoma, resulting in Mother having to move out of her grandmother's home. Mother moved in with a friend in Oklahoma. As for Temperance, she went back to live with Petitioners in Tennessee. Unfortunately, after living for a brief period of time with a friend, Mother became homeless. Upon learning of this development, Petitioners paid for Mother to be able to live in a hotel. Mother accepted Petitioners' help, but the fundamentals of Mother's situation in Oklahoma did not improve. Mother took several trips back to Tennessee to handle legal matters related to the custody of Temperance's older half-brother, who was no longer living with Mother, and to visit with Temperance. Petitioners helped Mother to pay for travel. Mother then accepted an invitation to move into Petitioners' Clarksville, Tennessee, home in 2017. Mother and Temperance lived together with Petitioners until January 2019.

In the beginning, this living arrangement was largely a positive experience. Paternal Grandfather, who has subsequently retired, worked as a military anesthetist at Fort Campbell and was frequently out of the house working long hours, but Mother developed a close relationship with Paternal Grandmother, who was a school teacher. While Mother

2

lived with them, Mother's older son, Temperance's half-sibling, was not living with Mother but instead with a different paternal grandmother who was caring for him. During this time, Mother was dealing with legal matters related to Temperance's half-brother, as to whom she would eventually lose legal custody. Petitioners attempted to help Mother improve her circumstances and to provide guidance, and Petitioners also helped Mother financially. Petitioners did not ask for any payment toward rent or utilities. They also provided Mother with money for a down payment on a vehicle, and Paternal Grandmother also cosigned on Mother's car loan. Mother worked while living in the Petitioners' home. Mother did not share her earnings with Petitioners, but she did make contributions to the household such as buying replacement groceries.

The relationship, however, started to sour. Mother's lifestyle and approach to parenting, and the Petitioners weighing in thereupon, seemingly became sources of friction. According to Petitioners, Mother would frequently disappear for days at a time, leaving Temperance alone with them, without having given any advance notice or indicating where she was or whom she was with during these time periods. Petitioners also indicated that Mother would regularly be oblivious to Temperance in favor of watching television, leaving Temperance unattended and crying. Paternal Grandfather described Temperance as being hungry or needing to be changed while Mother occupied herself with being entertained by the television. Mother denies this.

Another source of friction became how Mother, who has epilepsy, managed her medical condition. According to Paternal Grandfather, Mother experienced at least two seizures while living in Petitioners' home. Paternal Grandfather testified that he administered first aid on both of these occasions. Petitioners indicated that Mother did not adequately address her condition through medical treatment and that Mother engaged in dangerous practices such as driving shortly after having seizures.[2] Paternal Grandfather

---

[2] With regard to the intersection of epilepsy, seizures, and driving, Tennessee law provides, in part, as follows:

> (h) The Department shall suspend and/or shall not issue a driver license to anyone who suffers from uncontrolled epilepsy (also known as a seizure disorder) . . . or other conditions until the driver has remained seizure-free or lapse free for a period of one (1) year, and then only upon receipt of a favorable medical statement from the driver's licensed medical professional. Provided, however, the driver may be approved for driving privileges if the driver's condition has been controlled for six (6) months and the Department receives a favorable medical report or statement from the driver's licensed medical professional and the Department approves the issuance of the driver license.

> (i) In the following cases, the driver may be immediately suspended until the driver submits the medical information required by subparagraph (c) and the medical information is reviewed in accordance with this rule:

>> 1. The driver admits to a history of seizures or other conditions that seriously affects driving ability; or

3

indicated that Mother would go driving immediately after recovering from a seizure. Mother denies having more than one seizure while living with Petitioners and rejects any suggestion that she drove her vehicle immediately thereafter, stating, "After having an episode, I get really tired. It drains . . . every piece of me. All I do is sleep for at least 24 hours. . . . I did not leave. I am out." Mother's denial of driving after a seizure only relates to this time period.

Shortly after returning from a December 2018 trip to Germany, Mother moved out of the Petitioner's home, taking Temperance with her. Paternal Grandmother promptly brought a dependency and neglect action in the Juvenile Court of Montgomery County. On January 25, 2019, the court entered an order awarding Paternal Grandmother temporary custody of Temperance pending a dependency and neglect hearing. In order to retrieve Temperance, Petitioners traveled with police to an "empty apartment that had absolutely not one stitch of furniture in it" but did house Mother, at least one unknown individual, and Temperance. This unknown individual was later identified as Jacob Alkon, a romantic partner of Mother's. Mother testified that she was in a relationship with Mr. Alkon for some time but that she cut off the relationship in 2020 after he injured her in an act of domestic violence. Mr. Alkon was later arrested on charges of domestic abuse and pled guilty to one count of domestic assault, resulting in his imprisonment.

Shortly thereafter, and before the juvenile court adjudicated whether Temperance was a dependent and neglected child, Paternal Grandmother took possession of the vehicle as to which she had co-signed for the loan. The parties disagree about how this came to pass. According to Mother, Paternal Grandmother "took [her] vehicle" without justification, eliminating her only means of transportation and causing her to lose "both of [her] jobs." By contrast, Paternal Grandmother testified that she, as one of the titled owners of the vehicle, received a notification that Mother had stopped making payments on the car note, raising the specter of repossession. To avoid that outcome, Paternal Grandmother indicated she paid off the remainder of the car note and took possession of the vehicle. The parties engaged in a legal dispute over the vehicle, but evidence was not presented to the trial court as to the resolution, if any, of this matter.

Paternal Grandmother noticed that Mother's car was equipped with an interlock device, which operates as a mandatory breathalyzer test. Testimony at trial confirmed that this device had been installed following Mother's conviction for driving under the influence. Mother acknowledges that her driver's license was revoked.

---

2. A person practicing in the medical profession submits information that a driver has a condition that renders them unsafe to drive.

Tenn. Comp. R. & Regs. 1340-01-04-.06(2)(h) & (i).

4

In February 2019, the Montgomery County Juvenile Court concluded Temperance was a dependent and neglected child. The court found: (1) that Mother "has not demonstrated a consistent ability to care for [Temperance], nor does she have a stable residence for her or the child. To wit: she is currently in a residence with no furniture and at least one unknown adult"; (2) Mother's decision to drive after having suffered two alleged seizures "poses a danger" to Temperance; (3) Mother had, historically, left Temperance with Petitioners on a number of occasions; and (4), "Mother cannot explain injuries to the minor child and admits to directing the older sibling to administer corporal punishment."

One of the injuries appears to be a bite mark that Petitioners discovered on Temperance's arm in January 2019.[3] The Petitioners initially believed the bite mark to have been caused by one of Temperance's cousins but learned information indicating that was likely not the basis of the injury. In addition to voluntarily surrendering his parental rights, Father testified in the termination case that Mother had admitted to biting Temperance as a "disciplinary act," but Mother denies this.

The Montgomery County Juvenile Court awarded Paternal Grandmother custody of Temperance, as well as authority "to make medical and other decisions she may deem appropriate for the best interest of the child," appointed a guardian ad litem (GAL) to represent the child's best interests, and set a hearing for May 1, 2019, in hopes of evaluating Mother's circumstances following a temporary separation from Temperance.

On May 10, 2019, the Montgomery County Juvenile Court amended its dependency and neglect order, concluding that Mother had made no apparent progress towards improving her circumstances. The juvenile court found that Mother "is in need of parenting skills in that she disciplines inappropriately," that Mother "currently lacks independent means of transportation and must rely on others to transport her," that Mother "[is] employed, [but] . . . barely makes sufficient income to take care of herself," and that "Mother's epilepsy poses a serious risk to the minor child and must be addressed appropriately." The latter concern appears to have been related to Mother's seizures and driving. The court ordered Mother to undertake a parenting assessment, specifically a non-self-reporting parenting assessment and to follow all recommendations. Mother was also required to appropriately address her epilepsy with the aid of a neurologist and to follow the plan of treatment. With concerns having been raised about the reliability of Mother's description of her treatment plan and adherence thereto, Mother was further required to provide a HIPAA release that would allow the Guardian ad litem access to her plan of treatment for epilepsy. In the interim, Mother retained the right to "supervised visitation with her daughter at reasonable times and places by agreement with the paternal

---

[3] There are no transcripts that have been filed in this appeal from the dependency and neglect hearings, but it appears from the trial testimony in the termination proceeding that the bite incident was among the unexplained injuries being referenced.

grandparents, who shall provide supervision for the visits." The juvenile court ratified a final version of this order on November 13, 2019. Mother did not appeal.

Paternal Grandmother testified that Judge Shelton, the trial court judge for the dependency and neglect proceedings, told the Petitioners they had total discretion to act in Temperance's best interest with regard to Mother's visitation. Specifically, Paternal Grandmother testified,

> He said that it was my – our discretion. . . . [O]nce he made that final order, he told the recorder he was – he was done. He came down and sat with us on the benches. And I clarified with Judge Shelton, ["]Does this mean, you know, that if I do not feel that it's in Temperance's best interest that, you know, I don't allow visitation?["] He said, ["]Absolutely, it is your job to make sure that considering the circumstances of this case, that [you] put Temperance's needs first, that [you] make sure that she is always safe and with a safe person in a safe environment.["]

Paternal Grandmother had been coordinating visits with Mother for her to see Temperance under the supervision of the Petitioners. After the finalization of the dependency and neglect proceedings, Paternal Grandmother continued to do so. Paternal Grandmother facilitated visits between Mother and Temperance on November 7, 15, and 28, 2019, at a local IHOP restaurant. The visits had been and remained after conclusion of the dependency and neglect proceedings a source of frustration and tension. Paternal Grandmother was frustrated with Mother about what she asserted was Mother's habitual no-showing for visits and contacting too late in seeking to arrange visits. Mother appears to have been frustrated with Paternal Grandmother's rules with regard to visits or at least Mother appears not to have entirely adhered to those rules. For example, Paternal Grandmother wanted Mother to contact her ahead of time to arrange visits, arranging weekend visits by Thursdays, but Mother would contact Paternal Grandmother the day she was seeking visitation or on Fridays seeking visitation for the weekend. Regarding no-showing for visits, Paternal Grandmother indicated that Mother missed most visits. Mother disagreed and suggested that missed visits were fewer in number than suggested by Paternal Grandmother and attributed those that were missed to miscommunications.

Paternal Grandmother and Mother agreed to another visit in December 2019 that would involve the three of them watching the movie *Frozen II* together at a movie theater. Paternal Grandmother had suggested seeing the movie together because she knew that Mother and Temperance were both fans of the first *Frozen* movie. The experience, however, led to further escalation of tensions and would be the last visit Mother would have with Temperance. Loud noises from the surround sound in the theater during the coming attraction portion of the screening quickly upset Temperance. She was crying that it was too loud and that she wanted to leave. After her attempt to cover Temperance's ears in the theater met with no success in calming the child, Paternal Grandmother took

6

Temperance out of the theater. Speaking in the lobby with Mother, Paternal Grandmother testified that she suggested to Mother that the three of them continue the visit in some other form including trying another movie screen. Paternal Grandmother indicated that Mother declined, indicating that she wanted to watch the movie and did not want to miss the beginning. This exasperated Grandmother, who could not believe that Mother was foregoing a visit with Temperance to see "a child's movie." Mother disagrees with this description of events. She testified that all three of them left the movie theater around the same time, and that they had simply opted to push the visit to a later date.

In any event, it is undisputed that no further visitation occurred. Petitioners decided that visitation with Mother was harmful to Temperance and that they would not allow Mother to see Temperance any further. It is not apparent that the Petitioners announced this definitively to Mother. However, on February 20, 2020, Paternal Grandmother sent a text informing Mother, "I think we are done with visitation for awhile especially after your behavior a couple of weeks ago. Just not going to tolerate your toxic behavior."

Mother continued throughout 2020 to send texts to Paternal Grandmother seeking to visit with Temperance. At times, Mother would send requests to see Temperance on several consecutive days. Many of these texts, which Paternal Grandmother indicated she felt bombarded by, received no response. Another common issue raised by Mother in her texts to Paternal Grandmother was Mother's dispute with Paternal Grandmother over the vehicle.

Mother and Mother's step-father testified as to repeatedly trying to drop off at Petitioners' home gifts and various items for Temperance, for example clothing. One such circumstance in which Mother did apparently drop off clothing for Temperance at Petitioners' home in October 2020 led to the following text exchange between Paternal Grandmother and Mother:

[Paternal Grandmother:] Under no circumstances are you to show up at our house without an invitation. Don't let it happen again.

[Mother:] Did my daughter get her clothes??? I really hope she likes them!!!!

[Paternal Grandmother:] Restraining order then? Your choice.

The parties disagree about whether Mother continued to send text messages seeking further visitation during 2021. Mother testified that she continued to regularly text Paternal Grandmother seeking to see Temperance, while Paternal Grandmother testified that she received no such texts. Mother submitted an exhibit that contains multiple texts she purportedly sent to Paternal Grandmother, in which Mother repeatedly requested to visit with Temperance during 2021, while Paternal Grandmother submitted an exhibit that purportedly demonstrates that she received no texts from Mother during this time period.

There are no responses from Paternal Grandmother to these 2021 texts.

Since Temperance was five or six weeks old, she has spent most of her life with her Paternal Grandmother and Paternal Grandfather. Temperance is closely bonded with both her Paternal Grandmother and Paternal Grandfather and is well adjusted to her current living environment. At the time of trial, she was preparing to start kindergarten. Petitioners play with Temperance. The Petitioners' home is filled with children's toys and games. As part of the Petitioners' play with Temperance, they engage her with learning play such as alphabet toys. They also listen to music together.

While Temperance was under the care of the Petitioners, Mother testified that she continued to work in 2019, 2020, 2021, and at some points during 2022. Specifically, Mother asserted at trial that she worked at Waffle House and a company called Lumber during 2019, A.O. Smith and Shiloh during 2020, Rainbow Title, Electrolux, Domino's, Speedway Café, and Aludyne in 2021, and Outback Steakhouse in 2022.[4] Mother testified that she was a recipient of Supplemental Nutrition Assistance Program ("SNAP") benefits at the time of trial due to the fact that she was currently unemployed, but noted that she was unemployed because she was in the process of completing a year-and-a-half-long cosmetology program through Austin Beauty College. Mother indicated that she had scheduled time to begin searching for jobs the week after trial. While suggesting a conflict, Mother provided only a thin explanation for why she could not work while attending the cosmetology program. Concerning her epilepsy diagnosis, Mother provided copies of medical records showing that she had been prescribed Keppra to reduce the likelihood of suffering seizures. Mother testified that she was taking her prescribed medication.

Multiple witnesses testified that Mother currently lives on her mother and stepfather's property. Mother lives in a shed that is entirely separated from the main home that lacks independent running water or electricity. She insists, however, that the building still benefits from electricity via extension cords running from the main house to the separate building and that she can obtain water in the main home. Mother and several of Mother's other witnesses testified at the time of trial in May 2022 that she had not experienced a seizure since 2021.

With Paternal Grandmother having decided not to allow her to visit Temperance, Mother testified that she decided to seek legal redress. Mother testified, she "finally was, what I believed to be, stable enough to handle [caring for Temperance] with work and financially [able to] handle it as well, and it was time" to seek a change. She tried to obtain an attorney but struggled to be able to afford an attorney and could not find one to take her case. In the Summer of 2021, Mother secured legal representation.

Having obtained legal representation, Mother filed on August 10, 2021, a *Motion to*

---

[4] Mother did not clarify when she stopped working at Outback Steakhouse.

*Modify Order* seeking court-ordered visitation and custody upon competition of the requirements set forth in the Montgomery County Juvenile Court's May 2019 *Amended Order* as to dependency and neglect. In her motion, Mother argued that her circumstances had materially changed in such a way that modification of the custody arrangement had become appropriate. Among other assertions therein, Mother asserted the following in support of her motion: (1) "Mother now possesses independent means of transportation"; (2) "Mother has sought out treatment for anger management and parenting classes at Centerstone"; (3) "Mother currently has sufficient living space for herself and [Temperance] at her parent's home and has plans to obtain a place of her own by early 2022"; (4) "Mother currently receives adequate treatment for her epilepsy"; (5) "Mother is currently enrolled at Austin Beauty College and, in addition to attending school, possesses gainful employment"; (6) "Mother has begun to make payments of monetary support to Paternal Grandmother"; and (7) "Mother has consistently attempted to coordinate with the Paternal Grandmother to see [Temperance], even on a supervised basis, which the Paternal Grandmother has never permitted. The Paternal Grandmother has abused the discretion provided to her under the Final Order . . . ."

On August 16, 2021, six days after filing her motion, Mother, who had not previously provided monetary support for Temperance, made a two-hundred-dollar payment to Petitioners for the support of Temperance. By the date of trial in May 2022, Mother, subsequently, made additional support payments for a total of $1,450.

Ten days after Mother's filing of her motion, Petitioners filed a petition in the Chancery Court of Montgomery County on August 20, 2021, seeking both to terminate Mother's parental rights and to adopt Temperance. The Petitioners alleged that Mother had abandoned Temperance. Mother denied that she had abandoned Temperance and asked the Chancery Court to address Mother's modification motion because Petitioners' filing divested the juvenile court of any jurisdiction related to "all matter[s] pertaining to the child." Mother later amended her answer to raise willfulness as an affirmative defense to her alleged abandonment of Temperance. On April 11, 2022, Petitioners amended their petition to include two additional grounds for termination: persistent conditions and failure to manifest an ability or willingness to assume custody.

A trial was conducted on Petitioners' termination petition on May 18, 2022. Multiple witnesses testified, including Father, Paternal Grandfather, Paternal Grandmother, Yolanda C. (the paternal grandmother who has custody of Temperance's half-brother), Macy M. (Mother's sister), Troy H. (Mother's step-father), Mother, Chelsie W. (Mother's half-sister), and Ricki H. (Mother's mother). The trial court took the case under advisement and solicited proposed findings of fact and conclusions of law from the parties. The final proposal, which was authored by the GAL, was submitted on July 11, 2022. The trial judge, Judge Crozier, did not complete and issue a final order in the case prior to the expiration of his term of office on August 31, 2022.

9

Petitioners filed a motion in the Tennessee Supreme Court in November 2022, asking the Supreme Court to direct the trial court to issue an opinion in the case. The Supreme Court denied that motion. In its order, the Supreme Court explained that Petitioners' case had been reassigned to Judge Wallace, who would decide the case.

Judge Wallace offered each party the opportunity to recall witnesses, but none of the parties decided that was necessary under the circumstances. Judge Wallace then reviewed "the transcript of the hearing, the proposed Findings of Fact and Conclusions of Law of each party, and various caselaw applicable to this matter," determined that "the proceedings in this case may be completed without prejudice to the parties," and provided a certification of familiarity with the case pursuant to Tennessee Rule of Civil Procedure 63.[5] At the choice of the parties, the trial court judge did not have any witnesses appear before him and instead reached a decision based entirely upon the transcripts and exhibits.

On February 2, 2023, the trial court entered an order terminating Mother's parental rights to Temperance. The trial court found four grounds for termination, including abandonment by failure to visit, abandonment by failure to support, persistent conditions, and failure to manifest an ability and willingness to assume custody. The trial court also found that the best interest of the child supported termination. The trial court found that all four termination grounds and the best interest of the child being for termination of Mother's parental rights were established by clear and convincing evidence.

The Montgomery County Clerk and Master's office signed a certificate of service stating that "a true and correct copy of the foregoing Order has been forwarded, via U.S. mail, postage prepaid" to Mother's counsel, Petitioners' counsel, and the Guardian ad Litem on the same day. However, Mother's counsel and the Guardian ad Litem came forward on March 29, 2023, asserting via affidavits that neither received notice of or a copy of the final order. Arguing that her non-receipt created a notice defect, Mother filed a motion asking the trial court to set aside and immediately re-enter the final order in order to reopen her window to appeal. After holding a hearing, the trial court granted Mother's motion, set aside the February 2, 2023 final order, and immediately re-entered its final order on May 3, 2023. In doing so, the trial court emphasized the importance of the subject matter of Mother's case, and found "[t]hat despite being certified to Mother's counsel, Counsel never received the final order prior to March 13, 2023."

Mother promptly appealed, challenging the trial court's conclusions on each ground for termination as well as its best interest determination. Petitioners defend the trial court's order on the merits. Additionally, Petitioners raise a subject matter jurisdiction challenge

---

[5] The parties do not challenge Judge Wallace's Rule 63 certification, his familiarity with the case, his chosen documents to review, or his determination that the case could be resolved without prejudice to the parties following his designation as successor judge.

related to the trial court's decision to grant Mother's motion to set aside and immediately re-enter the final order. Petitioners argue that Mother's appeal is untimely and, accordingly, this court lacks jurisdiction.

## II.

Petitioners challenge this court's subject matter jurisdiction over Mother's appeal of the trial court's ruling regarding termination of her parental rights. According to Petitioners, Mother's appeal could only have been timely if she had filed her notice of appeal within thirty days of February 2, 2023, the date the trial court originally entered its final order. *See* Tenn. R. App. P. 4. In support of this contention, Petitioners cite Tennessee Rule of Civil Procedure 5.02, noting that the Clerk and Master's certificate of service provides proof of perfected service and, by extension, notice to the parties that the appeal clock began on February 2, 2023. Rule 5.02 states, in relevant part, "Service on the attorney or on a party may be made by . . . mailing it to such person's last known address. . . . Service by mail is complete upon mailing." Tenn. R. Civ. P. 5.02(1). Petitioners stress the importance of the quoted language because the clerk's office signed a certificate of service indicating that it mailed a copy of the February 2, 2023 order to each attorney via certified mail. This fact, they imply, creates conclusive proof of perfected service.

Prior decisions of this court, however, explain that Rule 5.02 creates a rebuttable presumption in favor of perfected service that may be overcome. *See*, *e.g.*, *In re Joshua M.*, No. E2021-01527-COA-R3-PT, 2022 WL 4666232, at *7 (Tenn. Ct. App. Oct. 3, 2022) (citing *Orr v. Orr*, No. 01-A-01-9012-CH-00464, 1991 WL 226916, at *4 (Tenn. Ct. App. Nov. 6, 1991)); *Bd. of Prof'l Responsibility v. Curry*, 266 S.W.3d 379, 389 (Tenn. 2008); *see also MacDonald v. Smith*, No. 88-304-II, 1990 WL 3345, at *1 (Tenn. Ct. App. Jan. 19, 1990) (identifying the presumption of receipt). This standard reflects the reality that "[t]here obviously exists the possibility of proof that a document was not received even though a certificate of service appears on it." *Christy v. Christy*, No. M2021-00192-COA-R3-CV, 2022 WL 951254, at *6 (Tenn. Ct. App. Mar. 30, 2022) (citing *Est. of Vanleer v. Harakas*, No. M2001-00687-COA-R3-CV, 2002 WL 32332191, at *8 (Tenn. Ct. App. Dec. 5, 2002)). Where a party denies receipt and offers support from a disinterested witness or by corroborating circumstances, this presumption may be overcome. *Id.* (quoting *Caldarera*, 2015 WL 7890039, at *3). Ultimately, this matter presents a question of fact. *Id.*

Here, Mother's counsel and the Guardian ad Litem each presented sworn affidavits stating, "despite being certified to me, I never received the final order prior to March 13, 2023." The trial court held a hearing on Mother's motion to set aside and re-enter the final order and found a lack of notice to Mother. The trial court observed that "two out of the three attorneys on this case did not get notice of the final order being entered," which included not only Mother's counsel but also the Guardian ad litem. Based on that finding, we conclude the trial court did not err by setting aside and immediately re-entering its final

11

order in this case. *See Jerkins v. McKinney*, 533 S.W.2d 275, 280-281 (Tenn. 1976); *Tate v. Monroe County*, 578 S.W.2d 642, 643-44 (Tenn. Ct. App. 1978).

As Petitioners concede, if the trial court's setting aside and re-entering of its final order was permissible, this created a new thirty-day window for Mother to file a notice of appeal. The parties agree that Mother filed her notice of appeal within that window, meaning her appeal is timely. Accordingly, this court has subject matter jurisdiction to consider Mother's appeal of the trial court order terminating her parental rights.

III.

Turning to the merits of Mother's appeal, parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we generally review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

Our review in this case, however, has a nuance atypical of parental termination cases. As noted above, the term of office of the judge who presided over the trial and observed the live testimony of the witnesses ended before issuance of a decision in this

12

case. With the assignment of another judge to the case, the successor judge afforded the parties an opportunity to recall witnesses, but they instead elected to have the case decided upon the transcripts and exhibits. Accordingly, the trial court's factual findings, including the judge's credibility findings, were based *entirely* on the trial court's review of cold transcripts and exhibits. The successor judge did not observe any live testimony from any of the witnesses.

The Tennessee Supreme Court has explained that "[w]hen findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's." *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014). In reviewing factual findings in such cases, the Tennessee Supreme Court has indicated that Tennessee appellate courts afford "no deference and no presumption of correctness to the trial court's findings of fact." *Fisher v. Hargett,* 604 S.W.3d 381, 395 (Tenn. 2020); *see also Henry A. Knott Co., Div. of Knott Indus. v. Chesapeake & Potomac Tel. Co. of W. Virginia*, 772 F.2d 78, 85 (4th Cir. 1985) ("The problem of the successor judge . . . is that one person hears the testimony and another person makes the factual findings without having seen or heard the witnesses. . . . Deference to such findings, by . . . an appellate court, would be misplaced in such a case."); *Bankard Am., Inc. v. Univ. Bancard Sys., Inc.*, 203 F.3d 477, 481 (7th Cir. 2000) (observing that the typical standard of review relevant to factual findings "is not a good fit" in successor judge cases decided entirely upon the record because a successor judge "enjoyed no special advantage in determining credibility and gauging the evidence—he read the record, just as we have now done"). Accordingly, "when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence." *Kelly*, 445 S.W.3d at 693 (citing *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 271 (Tenn. 2009)); *c.f. Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997) (indicating that "where the issues involve expert medical testimony and all the medical proof is contained in the record by deposition, . . . then this Court may draw its own conclusions about the weight and credibility of that testimony, since we are in the same position as the trial judge"). The Tennessee Supreme Court observed that "[a]s to the successor judge's analysis of the trial record, this Court is in the same position to evaluate the transcript and exhibits as is the successor judge," and indicated that "a de novo review of the successor judge's analysis of the trial record is appropriate." *State v. Ellis*, 453 S.W.3d 889, 909 (Tenn. 2015). In a parental termination decision involving a successor judge deciding a case without hearing live testimony, this court observed that, while deference is normally afforded to a trial court's findings, where those findings are based upon the trial transcript and exhibits and not observation by the successor judge of live testimony, this court "may draw our 'own conclusions with regard to the weight and credibility' of the evidence." *In re Isaiah F.*, No. M2023-00660-COA-R3-PT, 2024 WL 1765247, at *4 n.3 (Tenn. Ct. App. Apr. 24, 2024) quoting (Kelly, 445 S.W.3d at 693). Applying this standard of review, without presumption of correctness as to the trial court's findings, we conduct our own de novo review of the transcripts and exhibits presented to the trial court. *See Sampson v. Aircraft Maint., Inc.*, No. M2021-

01277-COA-R3-CV, 2023 WL 164164, at *8 (Tenn. Ct. App. Jan. 12, 2023).

IV.

The trial court concluded that Petitioners established four termination grounds by clear and convincing evidence: abandonment by failure to visit, abandonment by failure to support, persistent conditions, and failure to manifest an ability or willingness to assume custody. Mother challenges the trial court's conclusions on each of these grounds. We will now address each in turn.

A. Abandonment by Failure to Visit

The trial court found that clear and convincing evidence established that Mother abandoned Temperance by failure to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2021 to June 30, 2022).[6] Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2021 to May 8, 2022). "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). It is the parent who "bear[s] the burden of proof that the failure to visit . . . was not willful. Such defense must be established by a preponderance of evidence." *Id.*

The trial court found that Mother did not visit in the four months preceding the filing of the termination petition. Mother does not assert otherwise and the record is clear that she did not visit during this four-month time period. In fact, the record establishes that Mother's last visit with Temperance was more than twenty months before the filing of the termination petition. Mother's last visit occurred in December 2019 at the disputed *Frozen II* viewing. The critical question with regard to this ground for termination in the present case is not whether the Mother actually visited — she did not — but instead whether her failure to visit was willful.

The testimony and evidence presented by both Mother and the Petitioners on this matter leaves much to be desired in achieving clarity, but the standard with regard to the willfulness defense is not one of clear and convincing evidence but instead preponderance of the evidence. Accordingly, the evidentiary deficiencies of both sides serve as a form of balance. We cannot agree with the trial court's conclusion that Mother does not have the better of the proof on this matter. As noted above, the trial court's findings on this matter were entirely based upon a review of the cold transcripts and exhibits as the case was tried in front of another judge, and, accordingly, those findings are not entitled to the same

---

[6] *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

14

deference that would be afforded if the trial court had observed the witnesses testify.

In the present case, it is undisputed that Petitioners would not allow Mother to see Temperance. Petitioners did this based upon what they believed to be in Temperance's best interest, and they believed that denying Mother visitation was within their discretion under the Order entered by the Montgomery County Juvenile Court at the close the dependency and neglect proceedings. With the Petitioners not allowing Mother to see Temperance, Mother testified that, once she was ready for custody, she endeavored to hire an attorney but could not persuade an attorney to take her case because she lacked the money to be able to obtain representation. In the Summer of 2021, Mother filed a motion seeking visitation with Temperance. This filing occurred during the critical four-month window preceding the filing of the termination petition. No evidence was presented to contradict Mother's testimony regarding seeking an attorney, being unable for financial reasons to secure representation, and then filing seeking visitation after she obtained representation. In other words, it is undisputed that Petitioners refused to allow Mother to see Temperance and that Mother sought legal representation and promptly filed as soon as she was able to obtain counsel.

The trial court, nevertheless, concluded that Mother failed to carry her burden of proof on this issue of willfulness. The critical determinant for the trial court on this matter was the dueling testimony and phone record exhibits related to text messages during 2021. Mother testified she continued to text Paternal Grandmother during 2021 seeking visitation with Temperance; Paternal Grandmother testified that she did not receive any such texts during 2021. Mother submitted an exhibit purporting to show numerous texts to Paternal Grandmother in which she asked to see Temperance, and Paternal Grandmother submitted an exhibit purporting to show that no such texts were received. In concluding that no texts seeking to see Temperance were actually sent by Mother during the four critical months of 2021, the trial court observed that the texts from Mother showed no responses from Paternal Grandmother.

Petitioners' exhibit notes in handwriting upon the document a phone number which is attributed to Mother. There is no actual testimony that this is Mother's phone number; it is simply a phone number handwritten on the Petitioners' exhibit. This number does not appear in the message log on Paternal Grandmother's record of received text messages, seemingly indicating that no text messages were received by the Petitioners from Mother. Testimony during the trial from both Mother and Paternal Grandmother, however, indicated that Mother had changed phone numbers. In reviewing the text messages, there is remarkable correlation between the dates and times that Mother sent text messages (according to Mother's exhibit) and the dates and times that Paternal Grandmother (according to Paternal Grandmother's exhibit) received texts from one particular phone number. Seemingly, either someone else was texting Paternal Grandmother from this number at the same random dates and times as the texts that Mother provided as part of her records of text messages sent to Paternal Grandmother, a remarkable coincidence, or the

Petitioners' phone records seem to reflect that Mother was, in fact, texting Paternal Grandmother. Furthermore, the number listed on Mother's text records as the recipient of Mother's texts is undisputedly Paternal Grandmother's phone number. In concluding that Mother had not carried her burden, the trial court placed weight upon the lack of response from Paternal Grandmother to Mother's texts. Paternal Grandmother, however, regularly did not respond to Mother's texts in 2020. Paternal Grandmother conceded that she often did not respond to Mother's texts. Finally, Mother's text message records reflect an indication of message blocking at one point, suggesting that Paternal Grandmother may have been blocking Mother's text messages.

The trial court properly determined that Mother did not visit Temperance, but the trial court erred in determining that Mother failed to carry her burden of demonstrating a lack of willfulness in her failure to visit by a preponderance of the evidence. Accordingly, the trial court erred in finding this ground for termination of Mother's parental rights.

### B. Abandonment by Failure to Support

The trial court also found that clear and convincing evidence established that Mother abandoned Temperance by failure to support. *See* Tenn. Code Ann. § 36-1-113(g)(1). Failure to support occurs when a parent fails to support his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102 (1)(B). As in the context of failure to visit, a lack of willfulness also exists as an affirmative defense to failure to support but only when a party properly invokes it. Tenn. Code Ann. § 36-1-102(1)(I).

Here, it is undisputed that Mother paid only two hundred dollars of support during the critical month four-month time period preceding the filing of the termination petition. The trial court concluded this was a token payment. In doing so, the trial court failed, however, to address Mother's means. The General Assembly has directed "[t]hat the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102 (1)(D). However, where the parent does make payment toward the support of the child, the General Assembly has provided that the determination of whether the support constitutes token support is assessed in relation to "the parent's means." Tenn. Code Ann. § 36-1-102 (1)(B). While lack of willfulness is an affirmative defense with regard to this ground for termination, the burden to show that support, if payment is made, is only token

16

remains with party seeking termination. *See, e.g., In re Stephen H.*, No. M-2022-00674-COA-R3-PT, 2022 WL 17843018, at \*5 (Tenn. Ct. App. Dec. 22, 2022) ("Although petitioning parties such as DCS no longer bear the burden of proving that the respondent parent 'willfully' failed to provide support, the petitioner must still present evidence of the parent's means when alleging that the support provided was merely 'token.'"); *In re Jayda J.*, No. M-2020-01309-COA-R3-PT, 2021 WL 3076770, at \*18 (Tenn. Ct. App. July 21, 2021) ("This Court has explicitly held that while the burden to prove a lack of willfulness now falls on the parent under section 36-1-102(1)(A), the burden to prove that support is token remains on DCS as the petitioner.") The Tennessee Supreme Court has indicated that "[i]n the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013).

The evidence related to Mother's means in the present case is extremely limited. In the present case, the record simply contains insufficient evidence to allow for a conclusion, by the required clear and convincing standard, that two hundred dollars of support was merely token in light of Mother's means. Accordingly, we conclude the trial court erred by finding that the Petitioners established by clear and convincing evidence the termination ground of abandonment by failure to support.

### C. Persistent Conditions

The trial court also found that the termination ground of persistence of conditions was established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). This ground has been statutorily delineated as follows:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe,

17

stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

*Id.*

"The failure to remedy the conditions which led to the removal need not be willful." *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016); *see also*, *e.g.*, *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *11 (Tenn. Ct. App. Apr. 20, 2023). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Accordingly, "this termination ground is not dependent on a parent's efforts to improve the circumstances that led to a child's removal. Rather, the focus lies on the results of those efforts." *In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *8 (Tenn. Ct. App. Feb. 24, 2023); *see also In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (noting that this "ground for termination [is] focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them").

"The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment." *See*, *e.g.*, *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *8 (Tenn. Ct. App. May 31, 2017); *In re Christopher M.*, No. W2014-02520-COA-R3-PT, 2015 WL 5011702, at *3 (Tenn. Ct. App. Aug. 24, 2015). The persistent condition ground for termination provides time for parents to remedy the deficiencies that led to removal of the child[7] but is designed to prevent the child's circumstances from remaining in a "lingering"[8] uncertain status where a parent has failed to remedy the deficiencies that led to removal and where there is little likelihood of deficiencies being remedied in the near future.[9] There are a wide variety of circumstances that can prevent a safe return. This court has repeatedly identified a lack of stable housing as a basis for establishing the termination ground of persistent conditions. *See*, *e.g.*, *In re Edward C.*, 684 S.W.3d 410, 430-31 (Tenn. Ct. App. 2023); *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *15 (Tenn. Ct. App. Dec. 4, 2023); *In re Emberley W.*, No. M2022-00157-COA-R3-PT, 2023 WL 180080, at *9 (Tenn. Ct. App. Jan. 13, 2023). This court has also considered a lack of means of transportation or a reliable

---

[7] Tenn. Code Ann. § 36-1-113(g)(3)(A).

[8] *See*, *e.g.*, *In re Daymien T.*, 506 S.W.3d at 474; *In re Jaylah W.*, 486 S.W.3d 537, 556 (Tenn. Ct. App. 2015); *In re A.R.*, 2008 WL 4613576, at *20; *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008).

[9] Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

18

transportation plan for a child as supporting termination under the ground of persistent conditions. *See, e.g.*, *In re Noah B.*, No. E2022-00432-COA-R3-PT, 2023 WL 3733827, at *9 (Tenn. Ct. App. May 31, 2023); *In re Kayleigh B.*, No. E2019-01153-COA-R3-PT, 2020 WL 1491375, at *14 (Tenn. Ct. App. Mar. 27, 2020).

With regard to the persistent conditions ground for termination, the trial court noted, in part, with regard to the original grounds for removal, the following:

> On May 6, 2019, the Juvenile Court . . . found . . . Temperance . . . to be dependent and neglected within the meaning of Tenn. Code Ann. § 37-1-102. . . . The Court found that Mother had not demonstrated a consistent ability to care for the child, nor did she have a stable residence for her or the child, nor did she have independent means of transportation or sufficient income to provide for her child. The Court was concerned that Mother posed a risk to the child while driving and being at risk of seizures and ordered her to compete a non-self-reporting parenting assessment and follow all recommendations. Mother was ordered to provide a HIPAA release to her Neurologist allowing the Guardian ad litem access to her plan of treatment.

Mother failed to appeal the Montgomery County Juvenile Court's dependency and neglect order.

As to whether the conditions resulting in removal persisted, the trial found, in part, the following:

> This Court finds that the conditions which led to the removal of her child . . . still persist some three (3) years later. No evidence was introduced that Mother had completed a non-self-reporting assessment, although she testified that she had completed anger management classes . . . . Mother introduced no proof that she had provided a HIPAA release to her Neurologist allowing the Guardian ad litem access to her plan of treatment for epilepsy. She was currently taking parenting classes but had not completed them . . . . Mother still had no stable housing and is currently living in a shed without running water in her family's back yard . . . . She had no vehicle and her driver's license was revoked . . . . In short, none of the conditions had been remedied.

The trial court expressed concern that Mother's failure to address these conditions created a continuing inability to parent Temperance. The trial court found Mother's failure to address to be "characterized by unchanging behaviors." Ultimately, the trial court concluded that each of the statutory requirements for the ground of persistent conditions was satisfied by clear and convincing evidence.

19

With regard to the lack of stable housing or transportation for Temperance, Mother's argument in opposition to the trial court's conclusion centers upon her completion of cosmetology school, which would follow shortly after the trial. Upon completion of cosmetology school, Mother indicated that she would then address the deficiencies with regard to stable housing and transportation. Accordingly, she contends there was a likelihood of these conditions being remedied in the near future.

We do not find error in the trial court declining to accept Mother's contention that change was shortly forthcoming as to these conditions. The persistence of conditions ground statutorily sets a six-month time horizon for parents remedying conditions that gave rise to removal of a child. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). After more than three years, with having had the problems as to stable housing and transportation identified by the trial court as bases for removal of her child, Mother had still not arrived at a point where these conditions had been remedied. Mother's history of deficiencies with regard to housing extends even further back than the removal of Temperance. Weeks after Temperance's birth, Mother lacked stable housing. She ended up homeless, with the Petitioners providing financial support to allow her to live in a hotel and then inviting Mother into their own home. When Mother left the Petitioners' residence, after living there from 2017 to the start of 2019, her housing circumstances were unstable. Those housing conditions remained unstable throughout the months during which dependency and neglect proceedings were before the Montgomery County Juvenile Court. More than three years later, at the time of the trial upon the petition to terminate Mother's parental rights, Mother's housing situation remained unstable.

Despite no indication of lack of physical or mental capacity to work, Mother had not stabilized these circumstances with more than three years to do so after the removal of her child. Her explanation of how the cosmetology program prevented her from working was remarkably thin. In her *Motion to Modify* filed in August 10, 2021, Mother had indicated that there was room in her mother and step-father's home for Temperance and her to live, and that she had plans to have a place of her own by early 2022. The evidence at trial did not support the contention that there was space in her mother and step-father's home for Temperance and Mother. Furthermore, the home of her own did not materialize by the time of trial in the middle of May 2022. Despite an ability to work to provide a stable home for Temperance, Mother failed to provide a safe and stable home.

The circumstances as to transportation are similar. Under the evidence presented, Paternal Grandmother paid off the loan on the vehicle that Mother was using. In the more than three years that followed, Mother neither obtained a means of transportation nor developed a reliable plan to be able to transport Temperance. Mother's license at the time of trial remained suspended. Mother was not working at the time of trial, and there was no indication that safe and stable housing or means of transportation would actually materialize in the near future.

20

We conclude the trial court did not err in concluding that clear and convincing evidence supported the ground of termination of persistent conditions.

### D. Failure to Manifest an Ability or Willingness to Assume Custody

Finally, the trial court also found clear convincing evidence that Mother failed to manifest a willingness and ability to assume custody of Temperance. *See* Tenn. Code Ann. § 36-1-113(g)(14). To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

Addressing this ground for termination, the trial court found the following:

> This Court finds by clear and convincing evidence that Mother has failed to manifest *either* an ability *or* a willingness to assume parenting

21

responsibilities and that placing the child in Mother's custody would pose a risk of substantial harm for the following reasons. The conditions which led to the removal persist to this date. The child was initially removed from Mother's home due to a lack of a stable residence, her propensity to leave the child with Grandmother and disappear with unknown persons and that she poses a risk to the child by driving and having periodic epileptic seizures . . . . Mother has provided no evidence to this Court that she had executed a HIPAA release to allow the Guardian ad litem access to her plan of treatment for epilepsy . . . . Mother testified that she had gone to the emergency room for a syncope episode but that it was not for epilepsy. The Court does not find this credible. Were custody to be returned, conditions in Mother's situation exist that, in all reasonable probability, would lead to further neglect or abuse of the child in that she has failed to procure housing fit for habitation, i.e., she is living in a shed with no running water and an extension cord for electricity. . . . She has no ability to provide for the child financially. She does not have a car, and her driver's license is revoked. Mother testified that the court did not advise her that her license was being suspended when she pled guilty to DUI. The Court does not find this credible.

The trial court found that Mother's living circumstances were "not a safe and stable environment for a child to reside in."[10]

The trial court concluded, and the record supports, that Mother's living circumstance is not a fit environment for a child and poses dangers to Temperance's safety. Failure to provide safe and stable housing has been identified as both a basis for finding a lack of ability to assume custody[11] and as a basis for concluding that there is a risk of

---

[10] In her briefing on appeal in opposition to the trial court's conclusion as to this ground for termination, Mother argues that there is neither clear and convincing evidence of lack of willingness nor of a substantial risk of harm to Temperance. Mother's argument regarding willingness misses the mark insofar as the parent must be both willing and able to assume custody, not one or the other. *See In re Neveah M.*, 614 S.W.3d at 677. Nevertheless, the challenge to the first prong of this ground for termination is not waived, and we consider both prongs in reviewing the decision of the trial court. The issue is not waived because in parental termination cases in Tennessee, "waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest." *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 (Tenn. Ct. App. Oct. 13, 2023) (quoting *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023)). "[I]t is incumbent upon this court to address each ground for termination pursuant to the Tennessee Supreme Court's directive to this court to 'review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.'" *In re Chance B.*, No. M2023-00279-COA-R3-PT, 2024 WL 764015, at *7 (Tenn. Ct. App. Feb. 26, 2024) (quoting *In re Carrington H.*, 483 S.W.3d at 525-26).

[11] *See, e.g.*, *In re Dakari M.*, No. M2022-00365-COA-R3-PT, 2024 WL 1269860, at *5 (Tenn. Ct. App. Mar. 26, 2024) ("The parents had not maintained stable housing or a stable source of income. They also had not stayed out of legal trouble. We agree that clear and convincing evidence established that

substantial harm to child.[12]  Also related to substantial harm, Temperance does not have a meaningful relationship with Mother and is closely bonded to her Paternal Grandmother and Paternal Grandfather.  The trial court concluded that the Petitioners' home is "the only home the child knows."  The Petitioners have been the source of stability for Temperance. Accordingly, given the absence of a relationship with Mother and the strong relationship with the Petitioners, there is a significant risk of serious psychological harm from placing Temperance in Mother's custody.  *See*, *e.g.*, *In re Royalty Y.*, No. W2023-01333-COA-R3-PT, 2024 WL 2042496, at \*7 (Tenn. Ct. App. May 8, 2024) (upholding determination of substantial psychological harm based upon concern about reuniting parent with a child who did not have a meaningful relationship with the parent and where the child was bonded with foster parents who wished to adopt); *In re Kaitlyn D.*, No. M2023-00658-COA-R3-PT, 2024 WL 1049483, at \*14 (Tenn. Ct. App. Mar. 11, 2024) (upholding determination of substantial psychological harm based upon reuniting parent with child who did not have a meaningful relationship with the parent and where the child was bonded with another caregiver who wished to adopt); *In re Chance B.*, 2024 WL 764015, at \*10 (noting a serious psychological harm from reuniting children with a parent with whom they have no relationship).

We find no error in the trial court's conclusion that this ground was established by clear and convincing evidence.

V.

Having concluded that at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, our focus shifts to what is in Temperance's best interest.  *See In re Audrey S.*, 182 S.W.3d at 877.  The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

Facts considered in the best interest analysis must be proven by "a

---

Mother and Father failed to manifest an ability or willingness to assume physical custody or financial responsibility."); *In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at \*6 (Tenn. Ct. App. May 28, 2021) (concluding that parent failed to manifest an ability or willingness to assume custody when the parent lacked steady employment, stable housing, or reliable transportation).

[12] *See*, *e.g.*, *In re Edward C.*, 684 S.W.3d 410, 434 (Tenn. Ct. App. 2023) ("Without a stable home or form of employment, we agree with the Juvenile Court that placing the Child with her would pose a risk of substantial harm to the physical and psychological welfare of the Child . . . ."); *In re Zachary F.*, No. E2023-00217-COA-R3-PT, 2023 WL 4994509, at \*14 (Tenn. Ct. App. Aug. 4, 2023) (concluding that a father's lack of housing qualified as one of two "sufficient bases upon which to conclude . . . that returning the child . . . would pose a risk of substantial harm"); *In re Tucker H.*, No. E2019-01970-COA-R3-PT, 2020 WL 1966320, at \*13 (Tenn. Ct. App. Apr. 24, 2020) ("At the time of the hearing, she did not have stable housing and had shown no ability to procure housing."); *In re Edward C.*, 684 S.W.3d 410, 434 (Tenn. Ct. App. 2023) ("Without a stable home or form of employment, we agree with the Juvenile Court that placing the Child with her would pose a risk of substantial harm.").

23

preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive

relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2021 to June 30, 2022).

The trial court's findings as the best interest factors were as follows:

(A)     *The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority*; This factor favors termination in that the child has been living in Petitioner's home for most of her life.  The Petitioner's home is stable and is the only home that the child knows.  If the child were to be disrupted from the Petitioner's home, it would likely be detrimental to the child's well-being and not in the child's best interest.

(B) *The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition*; This factor favors termination in that Petitioners have the child on a daily routine that provides structure and stability to which the child is accustomed.  To disrupt the child from the Petitioner's home would likely have a negative effect on the child's emotional and psychological condition.

(C) *Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs*; This factor favors termination.  Mother has parented the child on a limited basis and has not demonstrated the ability to care for the child's basic needs.   The Petitioners have provided continuity of care, stability for the child and have met all of the child's needs for the duration of the child's life, to include basic

26

needs and beyond.

(D) *Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment*; This factor favors termination in that Mother has never been the primary caretaker for the child and, therefore, no parental attachment exists. There is no reasonable expectation that a secure and healthy parental attachment will form as the child is almost six (6) years old and no evidence was presented that a bond between the child and Mother exists.

(E) *Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child*; This factor favors termination as Mother has maintained no visitation with the child and did not seek visitation with the child for over two (2) years.

(F) *Whether the child is fearful of living in the parent's home*; This factor is unknown as the child has never lived in Mother's home nor has she ever visited Mother's home.

(G) *Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms*; This factor is unknown for reasons stated above.

(H) *Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent*; This factor favors termination in that a parent-child relationship exists between the Petitioners and the child as they have served as parental figures for the child for most of her life.

(I) *Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage*; This factor favors termination in that the child has no relationship with most of Mother's family, although she does see her half-brother . . . through the child's custodian, his paternal grandmother.

(J) *Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol,*

27

*controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner*; This factor favors termination . . . . At the time of the hearing, Mother resided in a shed in her parents' backyard which was powered by an extension cord and had no running water. This is not a safe environment for a child to reside.

(K) *Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions*; This factor is unknown. There was no proof that Mother has participated in any programs or services to assist with her current circumstances.

(L) *Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department*; This factor is not applicable; the Department of Children's Services is not involved in this case.

(M) *Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest*; This factor favors termination in that the child has been in the custody of Petitioners for over three (3) years an[d] there is no record of Mother petitioning the Court for custody of the child.

(N) *Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult*; This factor is not applicable.

(O) *Whether the parent has ever provided safe and stable care for the child or any other child*; This factor favors termination in that Mother has not and currently cannot provide a stable and safe environment for the child. Mother has no home of her own and currently resides in a shed in her parents' backyard which has no electricity or running water which is not a safe and stable environment for a child to reside in.

(P) *Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive*; This factor is unknown. There was no proof presented of whether Mother had demonstrated the understanding of the basic and specific needs of the child.

(Q) *Whether the parent has demonstrated the ability and commitment to*

28

*creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive*; This factor favors termination. See factor (O) above.

(R) *Whether the physical environment of the parent's home is healthy and safe for the child*; This factor favors termination. See factor (O) above.

(S) *Whether the parent has consistently provided more than token financial support for the child*; This factor favors termination. Mother paid a token amount of support to the child in the amount of two hundred ($200.00) dollars for the entire time the child has been the care and control of the Petitioners.

(T) *Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child*. This factor does not favor termination. The Court heard no proof that Mother's mental or emotional fitness was at issue.

Additionally, the trial court also made the following findings:

*When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest*. This factor favors termination in that the child needs continued permanency in a safe environment and the Petitioners have provided such an environment and will continue to do so. . . .

Temperance has a significant bond with the Petitioners and is seemingly happy and healthy.

As noted above, our review of the trial court's factual findings in the present case is atypical of parental termination proceedings because this case was considered wholly upon review of the transcripts and exhibits by the trial court judge who replaced the trial court judge who had heard live testimony but whose term of office ended prior to a decision being rendered. There are factual findings as to which we depart from the trial court's understanding of the transcripts and exhibits. With regard to visitation, the evidence does not appear to support the trial court's conclusion that Mother did not try to visit Temperance for two years. Additionally, Mother, after the filing of the petition to terminate her parental rights, started to take anger management and parenting classes. Though she had only made one 200-dollar payment of support prior to trial, by the time of trial Mother had made 1,450 dollars in child support payments. The trial court also indicated that there was no record of Mother filing a petition to address custody, but the record does reflect the filing of a motion rather than a petition by Mother seeking a change in custody shortly

29

before the termination petition was filed. Finally, the Montgomery County Juvenile Court, in addressing the dependency and neglect petition, expressed concern about unexplained injuries to Temperance and ultimately concluded that Mother "disciplines inappropriately" and was "in need of parenting skills." The trial court's ruling in the dependency and neglect proceedings was not appealed.

While, as noted above, there are areas of factual divergence in our understanding of the evidence, the trial court's ultimate conclusion that it is in Temperance's best interest to terminate Mother's parental rights is a conclusion supported by clear and convincing evidence. Significantly, for almost the entirety of Temperance's life, her Paternal Grandmother and Paternal Grandfather have been the source of stability in her life. Their home has been the only home that Temperance has ever known. For Temperance, Paternal Grandmother and Paternal Grandmother are the parental figures in her life. She appears to be thriving under their care. It is with them that Temperance has a close bond while no such meaningful relationship exists for Temperance with her Mother. "This court has repeatedly indicated that '[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest.'" *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023) (quoting *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020)).[13]

Additionally, when Temperance was removed from Mother's custody, this did not spur Mother to act with any urgency to take significant steps to address the circumstances that led the Montgomery County Juvenile Court to conclude removal was necessary. The bulk of the efforts Mother made to address the circumstances leading to removal occurred more two years after her child was removed by court order from her custody, with some actions occurring three years after removal. While Mother resided with Petitioners, she often left for days at a time without any indication of where she was going or with whom. In these circumstances, Petitioners cared for Temperance as they had since she was only a few weeks old. While we cannot agree with the trial court's conclusion that Mother did not endeavor to visit Temperance, we do agree that she did not take the actions necessary to alter her circumstances so as to be able to recover custody, instead leaving Temperance for years with the Petitioners to care for her child. Even when Mother began to address deficiencies, she failed to address areas of significant concerns. Notably, Mother had not provided a safe and stable home for Temperance and none appeared close to materializing in the near future. She also failed to obtain transportation or develop a reliable transportation plan for Temperance. Additionally, while Mother has presented evidence

---

[13] *See also*, *e.g.*, *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).

that she has sought treatment with regard to her epilepsy, despite the directive from the Montgomery County Juvenile Court in the dependency and neglect proceedings and its concern in ensuring that the Guardian ad litem have access to Mother's treatment plan, she evidently did not provide the HIPAA release to allow access.

We have no doubt that Mother loves Temperance, and it may be in Mother's best interest to have custody of Temperance. It is not, however, Mother's best interest but instead Temperance's best interest that must be considered. The evidence presented demonstrates by clear and convincing evidence that the trial court did not err in concluding that it is in Temperance's best interest to terminate Mother's parental rights.

VI.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm judgment of the trial court. The costs of the appeal are taxed to the appellant, Heavenly B., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____
JEFFREY USMAN, JUDGE